UNITED STATES of America,
Plaintiff–Appellee,

v.

Glenn Martin HELLER d/b/a Beacon
Hill Gulf, Defendant–Appellant.

No. 1–7.

Temporary Emergency Court of Appeals.

Argued July 23, 1980.

Decided Nov. 25, 1980.

Harvey A. Silverglate, Silverglate, Shapiro & Gertner, Boston, Mass., for defendant–appellant.

Robert B. Collings, First Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on the brief for plaintiff--appellee.

Amicus Curiae briefs were filed by Maurice Langelier, Executive Director of The Bay State Gasoline Retailers Association and Allied Trades, Inc., and by Andrew H. Good, Boston, Mass, Chairperson of the Executive Committee of the Massachusetts Association of Criminal Defense Lawyers.

Before METZNER, GIGNOUX and LACEY, Judges.

LACEY, Judge.

Glenn Martin Heller appeals from a judgment of conviction entered upon a jury verdict in the United States District Court for the District of Massachusetts. We reverse.

## I

Heller, doing business as Beacon Hill Gulf, operated a retail gasoline station in Boston, Massachusetts, under a lease from Gulf Oil Corporation (Gulf) commencing August 18, 1976. Heller had previously been employed at the station by one MacNeil, whose lease with Gulf had been terminated by mutual agreement in July 1976. The prices Heller charged for retail gasoline in June 1979 led to his indictment and conviction on charges he willfully sold gasoline in July 1979 in excess of prices authorized by law.[1]

## II

Certain pricing regulations promulgated by the Federal Energy Office (FEO), see

---

1. Part 212 of title 10 of the Code of Federal Regulations purports to set the maximum price at which petroleum may be sold at any stage in the production and distribution process. The relevant portions of part 212 are set forth in the text pp. 2–3, *infra*. These pricing regulations were promulgated by the Federal Energy Office (FEO) pursuant to section 753(a) of the Emer-

gency Petroleum Allocation Act of 1973 (EPAA), which provides:

Not later than fifteen days after November 27, 1973, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed

note 1 *supra*, a predecessor to the United States Department of Energy (DOE), were central to Heller's conviction. Part 212 of the Code of Federal Regulations is entitled "Mandatory Petroleum Price Regulations." Section 212.10, "general rules," provides in part:

No firm (including an individual) may charge a price for any covered product which exceeds the maximum price at which that product is permitted to be sold to the class of purchaser concerned under this part.

10 C.F.R. § 212.10(a) (1979). "Covered product" is defined to include gasoline. *Id.* § 212.31. Subpart F. of part 212, "Resellers and Retailers," applies "to each sale of a covered product, other than crude oil by resellers, reseller–retailers and retailers." *Id.* § 212.91. It is undisputed that Heller was a "retailer" under the regulations. *Id.* § 212.31.

The starting point in our analysis is the basic pricing provision of subpart F, applicable to sellers in business on May 15, 1973, and who continued in business thereafter. It reads in part:

(a) A seller may not charge a price for an item subject to this subpart which exceeds the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned on May 15, 1973, plus an amount which reflects, on a dollar–for–dollar basis, the increased product costs concerned.

*Id.* § 212.93.

Since it is certain that it was intended by the Congress and FEO that all gasoline retailers, including those entering business after May 1973, be subject to price controls, we now must examine other pricing formulations and their coverage.

Subpart H of part 212 is entitled "New Items." The first section in subpart H, section 212.111, is the "New item and new market" rule. Subsection (a), the "New item" provision, provides in part:

(a) *New item.* (1) An item is a new item if·(i) The firm concerned did not produce or sell it in the same or substantially similar form at any time during the one-year period immediately preceding the day on which the firm offers it for sale. (A change in appearance, arrangement, or combination including a change in octane number does not create a new item. Ordinarily a change in fashion, style, form or packaging does not create a new item); and

(ii) It is substantially different in purpose, function, quality, or technology, or its use or service effects a substantially different result from any other item which the firm concerned currently sells or sold at any time during the 1–year period immediately preceding the first date on which the firm offers it for sale.

*Id.* § 212.111(a).

Subsection (b)(3) of section 212.111(b) provides the method for computing the base price of a "new item":

(b) *Base price determination–*

. . . . .

(3) *Resellers.* A reseller, reseller–retailer or retailer, offering a new item,

---

by) and at prices specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (d) of this section, such regulation shall take effect not later than fifteen days after its promulgation. Such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States.

15 U.S.C. § 753(a) (1976).

Heller's indictment was returned under section 754 of the EPAA, the enforcement provision, which provides for criminal penalties for violation of the Act:

Whoever willfully violates any provision of [a regulation or order promulgated under section 753(a)], shall be imprisoned not more than 1 year, or–

. . . . .

(iii) with respect to activities relating to the distribution of residual fuel oil or any refined petroleum product at the retail level or any other person shall be fined not more than $10,000 for each violation; or both.

15 U.S.C. § 754(3)(B)(iii) (1976).

shall for purposes of applying the price rule of § 212.93 determine the May 15, 1973 selling price for that item as the price at which that item is priced in transactions at the nearest comparable outlet on the day when the item is first offered for sale. For purposes of computing the "increased costs," the cost of the item first offered for sale shall be used rather than the May 15, 1973 cost.

*Id.* § 212.111(b)(3).

Subsection (c) of section 212.111, the "acquisition" rule, excepts certain "covered products" from the new–item rule. It provides in part:

(c) *Base price and bases production control levels upon acquisition.* (1) If a legal entity or a component of a legal entity determines a base price or maximum selling price, or ceiling price pursuant to this part for a covered product which it sells to a particular market and the entity, or component is subsequently acquired by another firm, *that covered product does not become a new item* with respect to the same market. The base price or ceiling price of the covered product with respect to that market remains the base price or ceiling price determined for it by the acquired entity or component.

*Id.* § 212.111(c) (emphasis supplied).

In response to a demand for a bill of particulars, and at trial, the government declined to take a position on which pricing rule, acquisition or new–item, applied to Heller, who, as has been noted, commenced doing business in August 1976. Instead, it contended that Heller was covered by one or the other and that, regardless of which rule applied, Heller's prices were in excess of prices allowed under both. App. at 61, 1136–37.

Heller argued that he was bound by neither rule: The "acquisition" rule did not apply to him,, because he had not acquired any "legal entity or a component of a legal entity" from MacNeil, the prior owner, and thus he was not bound by MacNeil's "base price"; and the new -item rule did not apply to him as a new operator–it controlled only the pricing of covered products recently added to an existing firm's product line for the first time and items previously sold by an existing firm but recently offered, for the first time, in a new market. *See* App. at 561 -62; Brief of Appellant at 24–27.

Simply stated, Heller's position at trial and here is that, although the aforesaid pricing regulations were drafted to cover all gasoline retailers, including those in Heller's position, there was an inadvertent "hiatus," lying between the acquisition rule and the new item rule. App. at 558. Relying upon this "hiatus," Heller contends that he was free at all times to charge for his gasoline whatever the market would bear.

### III

Heller's prosecution was not his first brush with the federal government in connection with his pricing policy. For six months prior to his arrest, Heller had been involved in DOE administrative proceedings. A brief description of these proceedings is required for an understanding of certain issues raised on this appeal.

Heller opened the station for business, on a twenty--four--hour basis, shortly after entering into his lease from Gulf in August 1976. App. at 1006–08, 1017. He admits that he concluded at the time that he was covered by federal regulations controlling prices of retail gasoline sales. *Id.* at 1012. In the course of the next two and one–half years, Heller was audited several times by DOE; on at least two occasions DOE auditors informed him that he was overcharging. *See id.* at 734, 755. Finally, on December 13, 1978, DOE served Heller with a Notice of Probable Violation (NOPV),[2] which alleged that, since commencement of operations in 1976, he had overcharged his customers a total of $81,202.03. App. at 154–59.

Under DOE's regulatory scheme, the charges in an NOPV must be answered properly and in time or the NOPV will

---

**2.** *See* 10 C.F.R. § 205.191 (1979).

ripen into a Proposed Remedial Order (PRO).[3] A PRO, in turn, must be properly answered or the director of DOE's Office of Hearings and Appeals (OHA) may issue a final Remedial Order.[4] Additionally, DOE may issue an Interim Remedial Order for Immediate Compliance (IROIC), which is effective upon issuance and remains in force unless rescinded, when it finds:

(1) There is a strong probability that a violation has occurred, is continuing or is about to occur;

(2) Irreparable harm will occur unless the violation is remedied immediately; and

(3) The public interest requires the avoidance of such irreparable harm through immediate compliance and waiver of the procedures afforded under §§ 205.191 through 205.199C.

10 C.F.R. § 212.199D (1979).

Just prior to filing his response to the NOPV, Heller was served on December 22, 1978, with an IROIC, which ordered him to immediately roll back his prices to the maximum allowable prices computed from the May 15, 1973, base, presumably a reference to the acquisition rule. *See id.* at 176–84. By DOE's reckoning, Heller was overcharging by $.12/gallon for regular, $.11/gallon for premium, and $.115/gallon for unleaded. *Id.* at 180. The IROIC also contained the following notice: "At any time after this Order becomes effective the DOE may refer this Order to the Department of Justice for appropriate action." *Id.* at 182.

Heller, through counsel, filed a notice and statement of objection with the OHA and on January 2, 1979, applied for a temporary stay of the IROIC. The following day, January 3, OHA Director Melvin Goldstein granted the temporary stay, thereby relieving Heller "of the obligation to reduce his retail selling prices for motor gasoline in compliance with the provisions of the Interim Remedial Order for Immediate Compliance pending the DOE's determination on an Application for Stay which Heller intends to file." *Id.* at 207.

Heller applied for a permanent stay in due course, and on January 28, 1979, Director Goldstein granted the stay, stressing "[t]he need to afford Heller an opportunity to defend the propriety of his pricing practices in the context of an adversarial proceeding before an adjudicatory body prior to ordering him to reduce his selling prices." *Id.* at 218. Reconsideration was requested by the Office of Enforcement of the Economic Regulatory Administration (ERA) of the DOE. At oral argument, Director Goldstein reaffirmed his decision to stay the IROIC, emphasizing that he considered Heller to have a strong position on the merits,[5] one that was likely to prevail:

To the extent that the Decision on Heller's request for a stay was not as explicit as it might have been on those points, we do conclude that the petition has shown a very strong likelihood, in fact a probability, a strong probability, of success on the merits and further that the petitioner would be subject to a gross inequity were it to be required, having made that showing, to go forward with the merits of the case and with the added requirement being imposed that it immediately comply with that Order, which is likely to be vacated and dismissed on its merits.

*Id.* at 237–38.

On March 6, 1979, the Office of Enforcement of the ERA rescinded the permanently stayed IROIC and issued a PRO, *see* App. at 291–305, proposing that Heller, on the date the order became final, immediately roll back his prices to the maximum allowable under the acquisition rule less an addi-

---

3. *See id.* § 205.192.

4. *See id.* § 205.199B.

5. What Goldstein meant by "on the merits" is hotly contested. Heller contends, of course, that Goldstein was referring to the merits of his pricing practices; the government, with some logic, argues that "the merits" refers only to

the merits of the IROIC. An IROIC requires a showing of irreparable harm, 10 C.F.R. § 205.199D(a)(2) (1979), which ERA was unable to make in this case. Thus, the government suggests Goldstein's remarks were intended simply to suggest that Heller was likely to succeed on the merits of his challenge to the IROIC.

tional $.03/gallon to refund overcharges. On March 16, 1979, Heller filed a timely notice and statement of objection, arguing that he "has committed no breach of any price regulations." *Id.* at 314.[6] The ERA, in its response, recognized Heller's position ("Heller makes the following arguments: 1. Heller did not violate the pricing regulations"), but reiterated that he was bound by the acquisition rule. *Id.* at 326–27. This was the administrative posture of the case on June 12, 1979, when Heller was arrested at his station.[7]

IV

Turning to the trial, the government called MacNeil, who testified to his operation of a station at the Beacon Hill Gulf site and the termination of his lease with Gulf in July 1976. MacNeil's Gulf Daily Report Sheet for May 15, 1973, established the selling prices for the three grades of gasoline sold at his station on that date: $.359/gallon for Gulftane (economy grade), $.379/gallon for Good Gulf (regular grade), and $.419/gallon for No–Nox (premium grade). *Id.* at 710.

The second witness was a Gulf terminal supervisor who produced documents which established the prices that MacNeil paid for the gasoline he received from Gulf in the two weeks immediately prior to May 15, 1973: $.304/gallon for Gulftane, $.309/gallon for Good Gulf, and $.344/gallon for No–Nox. Heller's first shipment of gasoline from Gulf, on August 18, 1976, cost him $.539/gallon for Gulfcrest (low–lead), $.529/gallon for Good Gulf, and $.564/gallon for No–Nox. *Id.* at 715.

Another government witness, also a Gulf employee, testified that after MacNeil and Gulf had terminated their lease Gulf adver-

tised for a dealer and that Heller applied, was accepted, and began operations on August 18, 1976. While the physical plant comprising Beacon Hill Gulf did not change from the time MacNeil ceased doing business and Heller began operations twenty days later, the number of pumps remained the same, and Heller received MacNeil's allocation of gasoline, *id.* at 719–22, Heller acquired no property from MacNeil.

Subsequent government witnesses testified to the substance of the visits to Beacon Hill Gulf by DOE auditors, to Heller's pricing practices and the extent of his overcharges at the time of these visits, and to his pricing practices and overcharges for the first two weeks in June, 1979, the period covered in the indictment. The overcharges for these two weeks, calculated from a base of May 15, 1973, *i. e.*, using the acquisition rule, were $.698/gallon for regular-grade gasoline and $.7013/gallon for unleaded,[8] totalling approximately $10,000 for the period. App. at 812–17.

The government also produced testimony from Fred Bernard, manager of pricing allocation for Cities Service Company, who testified as to the retail prices charged in August 1976 at a nearby Cities Service station, one purportedly similar to Heller's Beacon Hill Gulf in that it sold only gasoline, had no service capability, and did not sell tires, batteries, or accessories. *Id.* at 793. Presumably upon the assumption that this station was comparable to Heller's within the meaning of the "nearest comparable outlet" language of the new–item rule, the government adduced testimony that Heller's maximum allowable selling price for retail sales of gasoline calculated under the new–item rule was even less than under the acquisition rule, resulting in

6. This was, however, only an argument caption. The argument itself addressed specifically only ERA's contention that Heller had violated the general pricing rule, 10 C.F.R. § 212.-93(a) (1979), and the acquisition rule, *id.* § 212.111(c). The new–item rule was not mentioned.

7. Subsequent to Heller's arrest, OHA heard argument on the PRO and, on July 10, 1979, issued a final remedial order. *See* App. at

459–67. Heller has appealed this order to the Federal Energy Regulation Commission, *see* 10 C.F.R. § 205.199C (1979), where a decision is now pending.

8. DOE calculated Heller's ceiling price at $.831 for regular, $.8677 for unleaded during the period of the indictment. During this period Heller was charging $1.529 and $1.569 for regular and unleaded, respectively. App. at 812–16.

greater overcharges. *Compare id.* at 794 *with id.* at 804.

Claiming that he was not bound by any regulations in setting his prices, Heller did not dispute at trial that his prices in June 1979 were set without regard to any maximum allowable selling price under the regulations. Heller's evidence was addressed almost entirely to the issue of willfulness and his understanding that he was not covered by any of the price regulations.

Heller called as his first witness Steven Brody, his lawyer in the administrative proceedings before DOE, who testified that Heller had sought his advice after receiving the NOPV in December 1978. He testified that after reading the regulations, reviewing the notice, and consulting with another lawyer, he advised Heller that the regulations did not limit him in anyway as to the maximum price at which he could sell his gasoline. *Id.* at 859, 862. Although Brody testified at length as to the steps he took in response to the NOPV, the IROIC, and the PRO, his testimony remained that he at all times advised Heller that his prices for gasoline were not limited by the regulations. However, on cross–examination Brody admitted that on June 28, 1979, he had represented Heller at a hearing on the PRO before OHA and that, in response to a direct query from the OHA director whether Heller was covered by the new–item rule if he was not under the acquisition provision, he had responded: "[The] new market, new item regs may cover him. I don't, I haven't reached, I haven't gotten that far because no one has ever told me that I have to defend that here and it is not before this body right now." *Id.* at 966.

Heller's next witness was the Executive Director of the Bay State Gasoline Retailers' Association. He testified that in August 1977 he informed Heller that he was not bound by the May 15, 1973, margin of the prior lessee of the Beacon Hill Gulf station. *Id.* at 998. He further testified that he had given the same advice to Heller

in December 1978. *Id.* at 999. The witness did admit on cross–examination, however, that he had never told Heller that he was not bound by any of the regulations; his advice was limited to telling Heller that he was not governed by the May 15, 1973, margin of MacNeil. *Id.* at 1001–03.

As his last witness, Heller himself took the stand. He testified that he was advised by his lawyers and the Executive Director of the Bay State Gasoline Retailers' Association that he was not bound by any of DOE's pricing regulations and that he believed in June 1979 that he could charge anything the market would bear, even if that meant charging $10 per gallon. *Id.* at 1060, 1071, 1078--79.

## V

Both at the close of the government's case, after all the evidence was in, and following the verdict, Heller moved for judgment of acquittal, arguing that there was insufficient evidence of willfulness, as a matter of law, to justify conviction; that he was not covered by the pricing formula contained in the regulations; and that, because during the period covered in the indictment he was involved in administrative proceedings with DOE, the government was effectively barred from prosecuting him. *Id.* at 837--47, 120--21, 122–27. These motions were denied. *Id.* at 844, 1127, 1246.

Also rejected by the trial court was defendant's proposed jury instruction that Heller was not governed by any maximum selling price established by the regulations. *See* Defendant's Supplemental Instruction No. 1, *reprinted in* App. at 113. The court charged the jury that, as conceded by Heller, the defendant was a retail gasoline dealer who, on the dates in question, sold regular and unleaded gasoline at the prices alleged in the indictment. App. at 1210–11. The court also charged that the defendant "was covered by the regulations" and had charged in excess of the maximum allowable selling price for his gasoline[9] and that,

---

**9.** In this regard, the court instructed the jury: ... I instruct you ... that the defendant was covered by the regulations and that he

was therefore subject to the regulations that provided for a maximum selling price. Since the parties have stipulated what that was, it

therefore, the sole question for the jury was whether Heller had acted willfully. *Id.* at 1210–12.[10] The jury returned a verdict of guilty on all counts submitted to them.[11]

## VI

We turn to Heller's contention that, despite the broad coverage of the pricing regulations, there is a lacuna into which he is fortunate enough to fall. We do not agree.

 It is clear, however, that Heller was not covered by the acquisition rule. On its face, the rule applies only to those who acquire a "legal entity or a component of a legal entity" that has previously determined the base price for a given covered product. While the prior operator, MacNeil, who had been in business on May 15, 1973, had determined the base price for the gasoline he sold, *see* 10 C.F.R. § 212.93 (1979), Heller acquired nothing from MacNeil. Since Heller did not acquire a "legal entity" etc. from

MacNeil, he did not acquire MacNeil's base price.[12]

On the other hand, it is certain that the regulations were intended to cover all gasoline retailers. Gasoline is a covered product, 10 C.F.R. § 212.31 (1979); Heller is a retailer, *id.* § 212.91.[13] Thus, the regulations were intended to cover those in Heller's position; and Heller has admitted as much at oral argument before this court.

It is clear from reading section 212.111(c) that Heller is covered by the new–item rule. Having commenced business in 1976, his base price became determinable at that time under the new--item price formulation. Heller's contention that the rule applies only to new products offered by an existing business is without merit.

Heller argues that he was not governed by the new--item rule because that rule contemplates only items sold by firms that have been in business at least one year prior

---

is established that he charged in excess of the maximum allowable selling price. That is, if you will compare the maximum allowable price, which I instruct you applied to Mr. Heller, with the price that he actually charged, you will find that he charged in *excess of the maximum allowable.*
App. at 1211.

It is noted that the stipulation referred to did not cover the maximum allowable price under the new–item rule. The court here seemingly was under the impression that there was only one maximum allowable price, applicable both to the acquisition rule and the new–item rule.

**10.** At the Rule 30 conference, *see* Fed.R.Crim.P. 30, *held prior to the last day of trial, defendant* had objected to this instruction in a number of respects, that most pertinent here being that an instruction by the court that the regulations applied to Heller was effectively an instruction to find defendant guilty. App. at 1096. This objection was renewed, albeit only in conclusory terms, following the court's charge. At the side–bar conference immediately following the court's charge to the jury, defendant's counsel stated: "Your Honor, first of all, I just generally reiterate whatever was discussed yesterday, and the objections that I stated yesterday still stand." *Id.* at 1221.

**11.** The indictment was originally returned in 28 counts, one count for each day on which Heller was accused of overcharging for regular gasoline during the two–week period covered by the indictment, and one count for each day on

which he was accused of overcharging for unleaded gasoline during the same period. Count 27 was dismissed by the court, with the government's consent, prior to the close of evidence.

**12.** If DOE and its predecessors intended the acquisition rule to govern those in *Heller's* position, the clear and unambiguous language that they have used in other price regulations only emphasizes their failure to express adequately this intention in section 212.111(c). For example, while the acquisition rule uses the phrase "acquire the legal entity" to define those who are bound by a predecessor's base price, the transfer of entitlement/allocation rule, which defines the quantity of gasoline to which a retailer is entitled when his predecessor has gone out of business, applies to all companies that are "successor on the site" of a prior business. 10 C.F.R. § 211.106(e) (1979). Where particular language is used in one section but not another, the term or its equivalent should not be implied where excluded. *FTC v. Sun Oil Co.,* 371 U.S. 505, 514–15, 83 S.Ct. 358, 364, 9 L.Ed.2d 466 (1963); *Kraus & Bros. v. United States,* 327 U.S. 614, 625–26, 66 S.Ct. 705, 709, 90 L.Ed. 894 (1946); *Bott v. American Hydrocarbon Corp.,* 458 F.2d 229, 233 (5th Cir. 1972).

**13.** Moreover, *all* retailers in business on May 15, 1973, were covered from the date the regulations became effective. *See* 10 C.F.R. § 212.-93 (1979).

to offering the item. He points to the following language of the rule:

> (a) *New item.* (1) An item is a new item if–(i) The firm concerned did not produce or sell it in the same or substantially similar form at any time during the one–year period immediately preceding the day on which the firm offers it for sale.

*Id.* § 212.111(a)(1)(i). Thus, Heller contends, the rule applies only to "new" products offered by an existing business. This position is without merit.

For purposes of section 212.111 the universe of gasoline retailers here can be viewed–as of August 1976, when Heller commenced doing business–as containing four distinct categories:[14] (1) retailers in business for more than one year as of August 1976 who then added new covered products to their product line; (2) firms commencing business in August 1976 that acquired an existing "legal entity" and continued, unchanged, the product line; (3) firms commencing business as of August 1976 that acquired an existing "legal entity," continued some or all of the acquired firm's covered products, and offered, in addition, covered products that had not been offered by the acquired entity; and (4) firms commencing business as of August 1976 that did not acquire an existing "legal entity."

■ Heller admits the first category of retailers is covered by the new–item rule. The second category of retailers, he concedes, is covered by the acquisition rule. As to the third category, the language of the acquisition rule that states that certain covered products will not become new items contemplates that other covered products can and will become new items, that is, that some acquiring firms may not only continue to market covered products previously offered by the acquired entity but may add additional covered products, not previously

offered, which products will be considered new items. Given that this third category of retailers will, as to some products, be governed by the new–item rule, it is clear that this rule covers not only new items offered by existing companies, as Heller contends, but also items which are "new" because they are offered by new companies. This is the fourth category, into which, we find, Heller falls.

Any other interpretation would produce incongruous, if not absurd, results. Heller's position would create an irrational distinction between those who enter the retail gasoline business by buying an "existing legal entity" (and are governed by the pricing regulations as to covered products previously sold by the acquired entity) and those who enter the business as Heller did (if the latter, as Heller contends, can charge whatever they choose for what are otherwise covered products). One entering the gasoline retail business after May 1973 could avoid price controls by not acquiring an existing "legal entity." Such an interpretation would destroy the price–control program.

## VII

■ The trial court never did resolve which rule, acquisition or new–item, governed Heller's prices; and, under the court's instructions, there was no necessity for the jury to resolve this issue. Indeed, the jury was not given any indication by the court that there was such an issue.

The trial court erred in submitting the case to the jury under an instruction that assumed that Heller had violated one or the other rule. He did not violate the acquisition rule because he was not subject to it.

Nor can the instruction be justified on the ground that the trial court was entitled to find as a matter of law that Heller had violated the new–item rule.

---

14. Since Heller was not accused of selling a covered product in a new market, this discussion does not encompass "new market" or the

permutations that such a consideration would entail.

Unlike the acquisition rule, which simply transfers a previously determined base price from a "legal entity" to its acquirer, the new–item rule requires that the base price of an item that falls within its purview be determined by applying to that item the nearest comparable outlet's base price for the same item. The testimony of Bernard of Cities Service Company, *see* p. 7, *supra*, offered by the government, was addressed to this subject.

The issue of comparability was a question for the jury. Regrettably, the trial court, by its instruction, removed this issue from jury consideration. To do so was error. *See, e. g., United States v. Martin Linen Supply Co.*, 430 U.S. 564, 572–73, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977); *United Brotherhood of Carpenters and Joiners of America v. United States*, 330 U.S. 395, 408, 67 S.Ct. 775, 782, 91 L.Ed. 973 (1947); *United States v. McClain*, 545 F.2d 988, 1003–04 (5th Cir. 1977); *United States v. Sheldon*, 544 F.2d 213, 221 (5th Cir. 1976); *United States v. Hayward*, 420 F.2d 142, 144 (D.C. Cir.1969); *Master Transmission Rebuilding Corp. & Master Parts, Inc. v. NLRB*, 373 F.2d 402, 406 (9th Cir. 1967); *United States v. England*, 347 F.2d 425, 430 (7th Cir. 1965).

## VIII

■ Heller raises several other grounds for reversal, only two of which warrant discussion.[15]

Heller charges that it was fundamentally unfair for the government to prosecute him criminally while he was in the midst of administrative litigation concerning the price regulations. He attempts to fit this case into the rubric of what has come to be called the constitutional tolling doctrine. Broadly stated, this doctrine holds that it is a violation of due process to subject to a regulation's penalties one who is judicially litigating the validity of that regulation. *See Wadley v. Southern Ry. of Ga.*, 235 U.S. 651, 35 S.Ct. 214, 59 L.Ed. 405 (1915); *United States v. Pacific Coast Conference*, 451 F.2d 712 (9th Cir. 1971). However, simply stating the doctrine suggests its inapplicability: Heller was administratively litigating the narrow question of the applicability of the acquisition rule, a rule we today find inapposite, rather than the validity of the regulations as a whole. Indeed, Heller's counsel admitted as much before the OHA when asked whether the new–item rule would apply if the acquisition rule did not: "... I haven't gotten [as far as reaching a conclusion on that question] because no one has ever told me that I have to defend that here and it is not before this body right now." App. at 966. We thus find this contention without merit.

■ Finally, Heller contends that various representations to him by DOE agents–to the effect that the new--item rule did not apply to him--preclude the government from prosecuting him under that rule. This contention, too, must fall, because each of these representations was made to Heller in the context of a DOE auditor telling him he was bound by the acquisition rule, not the new--item provision. There was never any

---

**15.** Heller also assigns error to other instructions of the trial court. We have examined these contentions and find them for the most part without merit. We note, however, that, as to reasonable doubt, the court charged:

Beyond a reasonable doubt means that it is beyond a real doubt, it is a doubt based on reason, on common sense, after consideration of all the evidence in the case. *It is not proof beyond all possible doubt. It is proof of such a convincing character that we would be willing to act on it in the most important of your own affairs.*

App. at 1206 (emphasis supplied). While we need not reach the question whether the "willing to act" language of the court's charge constitutes reversible error, we disapprove its use. *See, e. g., Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954); *Scurry v. United States*, 347 F.2d 468, 470 (D.C. Cir.1965).

Finally, Heller argues that the government's evidence was insufficient to prove willfulness beyond a reasonable doubt. This contention, too, is without merit. It is clear from the record that there was sufficient evidence of willfulness to go to the jury.

representation to Heller that if the acquisition rule did not apply he was bound by *none* of the regulations. Plainly, if the acquisition rule were not to apply, the new–item rule–to which it is an exception–would. Thus, this claim must be rejected.

## IX

The judgment of conviction is reversed and remanded for a new trial in accordance with this opinion.