UNITED STATES of America, Plaintiff,

v.

**Glenn Martin HELLER, d/b/a Beacon Hill Gulf, Defendant.**

No. CR 79–314–T.

United States District Court,
D. Massachusetts.

June 30, 1982.

James L. Sultan, Harvey A. Silverglate and Silverglate, Shapiro & Gertner, Nancy Gertner, Steven M. Brody, Boston, Mass., for defendant.

Richard Stearns, Asst. U. S. Atty., Boston, Mass., for plaintiff.

## OPINION

TAURO, District Judge.

The defendant, Glenn Martin Heller ("Heller"), d/b/a Beacon Hill Gulf, has moved to dismiss an indictment charging him with the retail sale of gasoline at prices in excess of the maximum permitted under federal regulations. Alternatively, Heller has moved to suppress certain evidence critical to a successful prosecution. Allowance of the motion to suppress would, as a practical matter, preclude further prosecution of this indictment. A review of the case's procedural history is a helpful preface to consideration of the substantive issues involved.

### I

### *Procedural History*

A twenty-eight count indictment returned in June 1979 charged Heller with selling regular and unleaded gasoline at excessive prices during each of fourteen days in June 1979, in violation of then-current federal price control of regulations,[1] particularly the provisions of 10 C.F.R. Part 212 (Part 212). Heller was tried before a jury on the theory that he violated alternative price ceiling rules in the Part 212 regulations. One, the "New Item and Market Rule" (New Item rule), is directed at those operators who were not in the retail gasoline business on May 15, 1973. Basically, the New Item rule requires that retail gasoline dealers set their prices on the basis of prices charged "at the nearest comparable outlet on the day when the item is first offered for sale." *See* 10 C.F.R. Part 212, Subpart H, Sec. 212.111(b)(3). The second, alternative rule in Part 212, the Acquisition rule, excuses the setting of directly comparable prices by excepting certain "covered products" from the New Item rule. *See* 10 C.F.R. Part 212, Subpart H. Sec. 212.111(c). The government's theory of prosecution at

trial was that Heller violated either or both of the Part 212 rules. The jury returned a verdict against Heller on that basis, and the trial court entered a judgment of conviction.

On appeal, the Temporary Emergency Court of Appeals held that Heller was covered by the New Item rule, but that the government's reliance on the acquisition rule was erroneous because that rule did not, in fact, apply to the defendant. *United States v. Heller*, 635 F.2d 848, 855, 856–57 (Em.App.1980). The trial judge's instructions had not required the jury to focus on or specify a particular rule when determining the defendant's guilt or innocence. Because there was no way to determine whether the jury applied the appropriate or the inappropriate rule in rendering its verdict, the conviction was reversed and the case remanded for a new trial before this court. *See id.* at 858.

### II

### *The Fundamental Issue*

Faced with re-trial, Heller moved for a bill of particulars, and to dismiss the indictment on a number of grounds.[2] In response to this court's orders, the government filed an amended bill of particulars which specified the Cities Service Station at 326 Cambridge Street, Boston ("the Citgo station"), as the "nearest comparable outlet" (NCO) to Heller's station, for purposes of applying the New Item rule. Heller concedes that the Citgo station is the nearest outlet, but contests its comparability. The "comparability" issue is at the heart of Heller's alternative motions to dismiss or suppress.

Heller argues that the characteristics of his station are so critically different from the Citgo station that no reasonable jury could possibly find that the Citgo station was a "comparable outlet." Such a finding

---

1. The indictment is based on the enforcement provision of the Emergency Petroleum Allocation Act of 1973, as amended (EPAA), 15 U.S.C. Sec. 754(a)(3)(B)(iii), which prescribes criminal penalties for the violation of federal retail gasoline sale price regulations.

2. Several of the grounds now raised by Heller were also considered and rejected by the trial judge. Because of the position of this court, discussed *infra*, concerning the chief grounds of Heller's motions, it is unnecessary to consider his other proffered grounds for dismissal.

would be a prerequisite to a conviction of violating the New Item rule. Heller, therefore, urges this court to determine as a matter of law that the Citgo station is not comparable to his and that any evidence concerning the Citgo station be excluded or suppressed. Heller further argues that recent administrative rulings concerning his prices, considered in the context of facts about the regulatory scheme and his station, preclude prosecution now under the New Item rule itself and compel dismissal of the indictment in its entirety.[3] The issues raised by Heller's motion were the subject of an evidentiary hearing before this court.

### III

#### Recent Relevant Administrative Proceedings

While the parties were preparing for the evidentiary hearing on the comparability issue, the Office of Hearing and Appeals (OHA) of the Department of Energy issued, in October 1981, a Decision and Order that responded to Heller's earlier application for retroactive and prospective relief from the application of the price regulations contained in Part 212.[4] *DOE Decision and Order*, Case Number DEE–2142 (October 7, 1981) ("OHA Order").

The OHA held that Heller was not entitled to exception relief after July 15, 1979,[5] but was entitled to relief for the period prior to that date. Based on financial data that Heller submitted, the OHA found that compliance with the DOE regulations in

Part 212 "would have required Heller to operate at a significant loss" and "would have forced [him] to abandon his operation of the outlet." OHA Order, p. 5. Finding that Heller had shown that "retroactive exception relief [was] necessary to alleviate a serious and irreparable injury," *id.*, the OHA ruled that Heller could increase retroactively his maximum lawful margin above acquisition costs on sales of motor gasoline to 14.0 cents per gallon between September 26, 1976 and July 15, 1979.[6]

The OHA denied retroactive exception relief for the period after July 15, 1976 and before January 21, 1981,[7] on the ground that greater leniency in price controls after July 15, 1976 permitted Heller a mark-up that, in the OHA's view, precluded the need for exception relief. The OHA also denied Heller's request for permission to apply to his sales, during the exception relief period, the regulatory "banking" provisions of 10 C.F.R. Part 212.93(e). The "banking" provisions allow a seller, to the extent that he wishes to recover "product costs" he previously accumulated but did not recover in past retail sales, to include in his calculation of maximum lawful selling price any difference between his actual selling price and his maximum lawful selling price in a previous period.

Heller appealed the OHA's Decision and Order to the Federal Energy Regulatory Commission (FERC), pursuant to 18 C.F.R. Section 1.40, requesting more relief for the period before July 15, 1976, an extension of all relief to cover the period after July 15,

---

**3.** On November 13, 1981, Heller filed a "Consolidated Motion to Dismiss the Indictment," incorporating all grounds asserted in his prior, outstanding motions to dismiss.

**4.** As discussed *infra*, Heller's petition seeking administrative relief had originally been filed on February 1, 1979, after the Department of Energy had brought to his attention the issue of possible price violations, but before the period covered by the indictment.

**5.** The OHA dismissed as moot the issue of exception relief after January 28, 1981, in light of President Reagan's issuance of an executive order on that date which immediately exempted motor gasoline from the price and allocation

controls adopted pursuant to the EPAA. *See* OHA Order, p. 3.

On September 15, 1980, the OHA had tentatively determined that the application for exception should be denied. The October 1981 order, issued after Heller had filed objections to the tentative statement, reversed the tentative ruling and adopted a more favorable position on Heller's application.

**6.** The exception relief grant would permit a mark-up that is greater than that permitted by the New Item rule, on which the present indictment is based.

**7.** *See* note 5 *supra*.

1976, and permission to retroactively utilize the "banking" provisions for establishing his maximum lawful selling prices during the exception relief period.

On March 8, 1982, a Presiding Officer of FERC issued an order modifying certain aspects of the OHA order from which Heller had appealed. The FERC officer's order extended the relief accorded Heller by allowing him an additional 1.2 cents per gallon, or a total of 15.2 cents per gallon, in calculating his maximum lawful selling price for the period prior to July 15, 1979. In addition, the FERC officer ordered that Heller be permitted, in calculating his maximum lawful selling price, to utilize the "banking" provisions of 10 C.F.R. Section 212.93(e). *See Federal Energy Regulatory Commission, Proposed Order,* No. RA 82–5–000, p. 13 (March 8, 1982) ("FERC Order").

With the court's permission, the parties submitted briefs addressing the impact of the FERC Order for the court's determination on the issues raised by Heller's motion challenging the pending indictment. The FERC Order states:

> This order is based on the presumed validity of statements, allegations, and documentary material submitted by the participants. The order may be revoked or modified upon determination that the factual basis underlying the order is not correct.

FERC Order, p. 13. Heller has informed the court that he will not file objections to the FERC Order.

The government, however, has informed the court that the Office of the General Counsel of the Department of Energy, acting on behalf of the Secretary of Energy, has filed Comments "vigorously contest[ing]" the Order and "seeking reversal and remand." The filing of Comments challenging the proposed order of a FERC Presiding Officer is authorized under 18 C.F.R. Sec. 140(j)(3). A contested order becomes final only after a Final Order affirming, modifying or vacating the Presid-

ing Officer's decision and Proposed Order is issued by the full Commission. *See* 18 C.F.R. Sec. 140(k). To date, no Final Order addressing the filed Comments and the FERC Officer's Order concerning Heller's petition has been issued by the full Commission.

## IV

### *The Motion to Dismiss the Indictment or Suppress Evidence*

#### A. *Exception Relief Orders.*

■ The court must consider whether the administrative orders granting Heller "exception relief" preclude any conviction under the pending indictment. Each count in the indictment charges that the defendant's prices were "in excess of the maximum allowable selling price[s] as computed pursuant to Title 10, Code of Federal Regulations, Part 212, said regulations having been promulgated under Title 15, United States Code, Section 753(a) . . . ." No reference to Part 205, embodying the provisions governing exception relief, appears in the indictment. No determination that Heller was subject to the Part 205 regulations was made prior to the completion of all of the relevant acts charged in the indictment. Thus, at the time he acted, Heller could not possibly have had the criminal scienter necessary for a conviction under Part 205. *See, e.g., Bouie v. City of Columbia,* 378 U.S. 347, 362–63, 84 S.Ct. 1697, 1707–1708, 12 L.Ed.2d 894 (1964) (conviction reversed where judicial decision that statute proscribed defendant's conduct followed all acts charged in indictment). Consequently, any conviction under the indictment cannot be based on the Part 205 regulations.[8]

The indictment, however, expressly charges the defendant with violating the regulations contained in Part 212. Part 212 was in effect and applicable to Heller during the time period covered by the indictment, June 1979. Heller had filed a petition with the DOE challenging the applica-

---

**8.** The court need not consider whether an indictment expressly based on Part 205 could

support a conviction of this defendant.

bility of Part 212 to his station on February 1, 1979. Throughout the period of the indictment, Heller's petition for "exception relief" from the application of Part 212 was still pending and unresolved. Heller could have, but did not, request a stay of enforcement of Part 212, pursuant to 10 C.F.R. Part 205.120(b), pending the resolution petition. The indictment, citing Part 212, was returned in June 1979. The initial, tentative grant of exception relief from Part 212 did not occur until October 7, 1981, when the OHA issued its proposed order (see discussion *supra*).

Heller argues that the exception relief grant constitutes a controlling determination that proscribes the application of the Part 212 regulations to his case. The government responds that the orders granting relief from the Part 212 regulations requires and presumes their applicability to Heller's case. The government emphasizes that the regulations permitting applications like Heller's authorize possible relief to be given from the *effect* of the otherwise applicable regulations. *See, e.g.*, 10 C.F.R. Part 205.50(c).

Despite the fact that the administrative orders granted exception relief retroactively to cover the period of the indictment, the court finds no support for the view that the administrative orders purporting to excuse compliance with the Part 212 regulations automatically invalidate the criminal indictment charging their violation. *See, e.g., United States v. Arizona Fuels Corporation,* 681 F.2d 797, 799 (Em.App.1982) (supplementing and quoting 638 F.2d 239, 242 (Temp.Emer.Ct.App.1980), *cert. denied,* 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981)). This is particularly true in view of the fact that there is no certainty that the administrative findings will not be modified or reversed in their entirety at some future date.[9]

■ Whatever impact the administrative orders granting exception relief may have

on civil proceedings, any other potential criminal prosecutions, and on the issue of comparability in this case (discussed *infra*), the court finds that the administrative orders themselves do not *compel* Heller's exoneration from possible conviction under this indictment.[10] Accordingly, Heller's motion to dismiss the indictment on the basis of those orders is denied.

## B.  The Comparability Issue.

Remaining for consideration is Heller's request that the court rule, as a matter of law, that the government-designated "nearest comparable outlet", the Citgo station at 326 Cambridge Street, Boston, is not comparable to his own, within the meaning of the New Item rule price regulations in Part 212. *See* 10 C.F.R. Part 212.111(b). The court's determination on this issue shall take into account the evidence and arguments that the parties presented in their submissions and at the evidentiary hearing.

Heller's contention that the Citgo station and his own station are not "comparable" is based on the arguments that (1) the relevant scheme itself reflects the fundamental differences between the Citgo and Heller stations, and (2) relevant facts establish their characteristics to be so different as to preclude any basis of fair comparison for purposes of computing maximum lawful prices in this criminal proceeding.

Faced with Heller's request for a legal determination on the issue of "comparability", the court must take note of the Temporary Emergency Court of Appeals' characterization of the issue as one of fact:

> The issue of comparability was a question for the jury. The trial court by its instruction removed this issue from jury consideration. To do so was error.

*United States v. Heller, supra,* at 857. Thus, it is necessary for the court to review the relevant regulatory scheme to determine whether it is appropriate for the court itself to address the factual arguments and evidence.

---

**9.**  *See* discussion in Section III *supra*.

**10.**  In this regard, the court finds the effect of the administrative orders on the indictment in this case distinguishable from the effect of IRS rulings that may exonerate from both civil and criminal liability for past-due taxes.

### 1. The Regulatory Scheme.

The petroleum price regulations contained in 10 C.F.R. Part 212 were promulgated to apply to all sales of petroleum products in the United States. Within Part 212, sellers are divided into three categories, with different pricing rules for each type contained in separate subparts. Subpart F contains rules that apply to "resellers and retailers." The parties do not dispute, and the Temporary Emergency Court of Appeals held, that Heller's station falls within this category. Subpart E states the rules applicable to "refiners". Heller offered evidence confirming that the Citgo station falls within this category.[11]

Part 212 defines a "retailer" subject to Subpart F as

a firm . . . or that part of such a firm which carries on the trade or business of purchasing covered products and reselling them to ultimate consumers without substantially changing their form.

10 C.F.R. Part 212.31. The "retailer" price rules established a base price derived from the price at which the retailer sold gasoline on May 15, 1973. See 10 C.F.R. Part 212.-93(a). A retailer was allowed to raise prices to cover increased costs of obtaining his product, but prior to July 15, 1979, was significantly restricted in the amount of increased non-product costs he could pass on to consumers. See 10 C.F.R. Part 212.93(b).

Retailers like Heller who were not in business on May 15, 1973 were subject to Subpart H of the regulations for determining, under the New Item rule, base prices for the dates on which they began selling. The initial "base price" was determined, under Subpart H, as the price at which the product was sold in transactions at the "nearest comparable outlet" on the date the retailer began sales operations. See 10 C.F.R. Part 212.111(b)(3). The new seller's subsequent price changes were subject to the "retailer" rules in Subpart F.

Part 212 defines "refiner" as

a firm . . . or that part of such a firm which refines covered products or blends and substantially changes covered products . . . and sells those products to resellers, retailers, reseller-retailers, or ultimate consumers.

10 C.F.R. Part 212.31. The "refiner" price rules in Subpart E applied, therefore, to sales at the wholesale level by a refinery itself, as well as to sales at all subsequent levels of distribution, including sales to consumers.

Unlike the "retailer" price rules, the "refiner" rules permitted the passing through to consumers of *all* increased costs, both "product" and "non-product." No cents-per-gallon maximum increase was imposed. See 10 C.F.R. Part 212.83(c)(1). Further, the refiner rules permitted operators the flexibility to apportion increased costs of production or marketing *between* different products. See 10 C.F.R. Part 212.-83(c)(1)(ii)(A). In theory, this authorized refiners to adjust retail prices so as to meet local or regional competitive conditions and yet maximize profit in the parent-company refiner's overall operations.

Another aspect of the pricing rules that underscores the regulatory distinction between "retailers" and "refiners" concerns the disparate treatment that refiners themselves must accord to different classes of purchasers. The regulations define "class of purchaser" as

purchasers to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers and other purchasers.

10 C.F.R. Part 212.31. The Federal Energy Agency, which preceded the DOE, illustrated the "class of purchaser" concept by stating that refiners, in setting selling prices, should distinguish between dealers leasing stations from them from those stations which were wholly-owned or the otherwise independent. See Federal Energy Agency, Ruling 75–2. In another context, the Fed-

---

11. The third category, "producers", is covered by Subpart D of Part 212, and is not relevant here.

eral Energy Agency stated that a major petroleum corporation's marketing affiliates, like its refining divisions, were subject to the "refiner" pricing rules. *See* Texas City Refining, Inc., Texas City, Texas, 6 F.E.A. Par. 80,532 at 80,685 (1977).

In view of the significant practical effects that the differences in regulatory price treatment inevitably must have on the operations of "retailers" and "refiners", the court concludes that the question of whether a refiner's outlet may be considered "comparable" to a station like Heller's for purposes of applying the Part 212 regulations is a legal issue to be determined by the court. In making that determination, however, it is appropriate for the court to consider the factual evidence and arguments that the parties presented concerning the "comparability" issue in this case.

### 2. Evidence on the Issue of Comparability.

Heller began operating his station, Beacon Hill Gulf, 358 Cambridge Street, Boston, on approximately August 18, 1976.[12] Beacon Hill Gulf, covering an area of approximately 1,771 square feet, contains one island of five hoses and three pumps that can accommodate up to four vehicles at one time for retail gasoline sales.[13] Heller operated his station as an independent retailer-dealer, under a lease from Gulf Oil Company, dated September 24, 1976.[14] Leslie MacNeil, Heller's predecessor as lessee-operator of the station, went bankrupt in 1976.[15]

Heller's station has no service bays[16] and performs no repair work.[17] It does not have the capacity to stack a significant number of cars. It did not sell tires, batteries or accessories,[18] but did sell compressed air, motor oil, starting fluid, brake fluid, gasoline anti-freeze and maps.[19] Heller's chief source of income at his station was from the sale of branded fuel and related items.[20]

Prior to Heller's acquisition of Beacon Hill Gulf, the station had a history of operating twenty-four hours per day, seven days per week.[21] Heller intended to operate the station on an around-the-clock basis, but it was not opened on a twenty-four hour per day basis until September 1976 because sufficient manpower was not available until that time.[22] In operating Beacon Hill Gulf on a twenty-four hour per day basis, Heller paid additional overhead costs for labor, utilities and other necessary business expenses.[23]

Under the terms of his lease, Heller purchased his gasoline from the Gulf Oil Company, at prices determined by that company.[24] As lessee-retailer, Heller paid his supplier a price known in the industry as "dealer tank-wagon price."[25] Such price is derived by adding transportation and marketing costs to the costs of producing refined gasoline.[26] Heller set his selling prices with the goal of maximizing his profits from retail gasoline sales.

The Cities Service Station ("Citgo"), located at 326 Cambridge Street, Boston, was the station physically nearest to Beacon Hill Gulf at the time that Heller began his retail

12. Transcript of Evidentiary Hearing, December 3, 1981 (Day 1) [hereinafter "Transcript (I)"], at p. 88.

13. Transcript (I), pp. 88, 96.

14. Transcript (I), p. 97.

15. Transcript (I), p. 87.

16. Transcript (I), p. 89.

17. *Id.*

18. *Id.*

19. Transcript (I), p. 89–90, 96.

20. Transcript (I), pp. 89–92.

21. Transcript (I), p. 90.

22. Transcript (I), p. 92.

23. Transcript (II), p. 92–94.

24. Transcript (I), p. 107–08.

25. Transcript (I), p. 116.

26. *Id.*

gasoline sales.[27] It was operated by the Cities Service Company of Tulsa, Oklahoma,[28] a major oil refiner that leased the property on which the station was situated from the Jenny Manufacturing Company.[29] Excluding the surrounding parking area, the station covers approximately 3,876 square feet,[30] and contained one island with two pumps which could accommodate up to four vehicles at a time for retail gasoline sales.[31]

The Citgo station had no working service bays [32] and performed no repair work.[33] It could not stack a significant number of cars.[34] There was no evidence that the Citgo station sold tires or other automotive parts and accessories, nor that the Citgo station had any significant source of income except the sale of gasoline.

The management of the Citgo station intended that the station be operated on a twenty-four hour per day basis. The station was operated on a twenty-four hour per day basis when sufficient manpower and product supply were available.[35] It was not open on a twenty-four hour per day basis during August 1976.[36] The extent to which the Citgo station may have paid higher overhead costs for labor, utilities and other necessary business expenses, to operate on a twenty-four hour per day basis, is unclear.

The Citgo station obtained all of its gasoline from the parent refining company. The Cities Service Company determined the price which would be attributed to that gasoline on the financial records of the station and of the parent company.[37] The cost of gasoline to the Citgo station was set by the Cities Service Company as the "transfer replacement cost value",[38] which included the cost of raw materials, manufacturing and transportation of the product to the distribution point in Braintree, Massachusetts. That price is generally lower than that charged to independent retailers, such as Heller,[39] who was charged with "dealer tank-wagon price."

Rents paid by the two stations were approximately the same, and the expense pat-

27. Transcript (I), p. 52.

28. Transcript (I), p. 158.

29. Id.

30. Transcript of Evidentiary Hearing, January 19, 1982 (Day 2) [hereinafter "Transcript (II)"], pp. 10–11.

31. Transcript (I), p. 168.

32. Id.

33. Id.

34. Transcript (II), pp. 11–13.

35. Transcript (I), pp. 170, 171, 172–73.

36. Transcript (II), pp. 51–52. The parties dispute whether the Citgo station was open and selling gasoline on and around August 18, 1976, the date on which Heller first offered gasoline for retail sale. The government contends that the Citgo station was open during the days before and after August 18, 1976. Government's Proposed Findings of Fact, # 15, p. 3 (citing Transcript (II), pp. 31–46, 49; Government Exhibit # 4). Heller argues that the evidence is not conclusive on the question. Defendant's Proposed Findings of Fact, # 15, p. 9.

In the ordinary course of business, the manager of the Citgo station completed a daily stock and sales report. Transcript (II), p. 14. Such a report from August 18, 1976 would show that the Citgo station transacted business on that date. However, no such report was produced, either in response to the subpoena issued at Heller's request, or at the evidentiary hearing. According to Mr. Christodoulou, the daily worksheets for August 1976 were probably destroyed. Transcript (II), p. 17.

Heller testified that the Citgo station was closed during the week of August 18, 1976. Transcript (I), pp. 94–95. In response, the government introduced evidence that bank deposits were made on those days, though there was testimony that the dates of deposits did not necessarily correlate with the dates of the receipts. Transcript (II), p. 42.

However, because of the court's disposition of Heller's motion, infra, it need not determine from the conflicting evidence whether the Citgo station was or was not open for business on the date that Heller began selling gasoline, August 18, 1976.

37. Transcript (I), p. 165.

38. Transcript (I), pp. 165–66; Transcript (II), pp. 4–6.

39. Transcript (I), pp. 116–17 and Transcript (II), pp. 30–31.

terns of the two stations were in many respects similar.[40] Heller's station sold approximately 45,000 gallons of gasoline per month.[41] Between July and September 1976, the Citgo station's sales ranged from 30,000 to 52,000 gallons per month.[42]

The actual selling prices of gasoline at the Citgo station were established by Robert Clingan as Northeast Division Sales Manager, and his assistant, Louis Christodolou, First Assistant Manager and later Sales Manager of the Northeast Division of the Cities Service Corporation, Braintree, Massachusetts.[43] In general, both officials had responsibility for maximizing the profit at each operated station in the Boston area, including the Citgo station.[44]

The actual prices set by Mr. Clingan and Mr. Christodoulou at the Citgo station were, in fact, the highest prices set by them at any company-operated station in the Boston area.[45] Nevertheless, the Citgo station operated at a net loss in 1976 and 1977.[46] Mr. Clingan and Mr. Christodoulou did have to answer to the management of the Cities Service Corporation in Tulsa, Oklahoma, for operating the Citgo station at a loss, but were authorized to keep the station open until it became profitable. The Citgo station earned increasing net profits after December 1977.[47]

## V

### Conclusion

Having concluded that the administrative exception relief orders themselves do not compel dismissal of the indictment in this case, the court must decide whether the price control regulatory scheme, as applied to the facts concerning the Citgo and Heller

stations, render them noncomparable as a matter of law.

This court determines that the relevant regulatory scheme imposing gasoline price controls established a fundamental conceptual and practical distinction between independent retail outlets and refiner-operated outlets. There can be no reasonable dispute on this record that Heller operated as an independent retailer and that, during the relevant period, Citgo was a refiner-operated outlet. Although the two stations were superficially similar in some respects, Citgo, as a refiner-operated outlet, had the opportunity to sell gasoline at lower prices than did Heller. For example, Citgo could buy gasoline at the "transfer replacement cost value," while Heller was subject to paying the generally higher "dealer tank wagon price." Also, Citgo had greater flexibility in selling its gasoline, in that the station's profits could be stated in a variety of ways through different accounting procedures on its own books and on the books of the parent company. As Mr. Langelier, one of Heller's experts, testified, "[t]he refiner has the advantage of vertical profits," because

> [p]rofits ... are made from production, from transportation, pipe lines and so on, from refinery, the refining of product and transportation from the refinery to the terminal and also the profit from the terminal to the ultimate place of retail, to the dealer.[48]

Consequently,

> [T]he refiner has a flexibility of charging prices all the way up or down the line, can absorb losses ... where an independent dealer could not abosrb it [sic] for more than a month, the refiner can absorb it forever and ever, and it never

**40.** Transcript (I), pp. 92–94, 97 and 158; Transcript (II), p. 22.

**41.** Transcript (I), pp. 98–99, 152; Transcript (II), p. 7.

**42.** Transcript (II), p. 7.

**43.** Transcript (I), pp. 156, 159–60; Transcript (II), p. 3.

**44.** Transcript (I), pp. 160–65; Transcript (II), pp. 7–10, 18–20.

**45.** Government Exhibit # 2.

**46.** Transcript (II), pp. 9–10, 20.

**47.** Transcript (II), pp. 10, 18.

**48.** Transcript (I), pp. 117–18.

really comes out as far [sic] as their over-all picture.[49]

The parent refiner company Citgo, accordingly, did not need to be critically concerned, as did Heller, about whether profit appeared on the books of the individual retail outlet, so long as the parent company as a whole earned net profits.

Whether Citgo actually employed the pricing advantages of a refiner-controlled station is irrelevant to the narrow issue now before the court. What is relevant is that the disparate impact of the regulatory scheme afforded Citgo the unique opportunity to do so. It would be unreasonable to charge Heller with the duty of determining, when he opened his station, whether Citgo was actually taking advantage of price flexibility available to it under the refiner station rules. Indeed, it is difficult to imagine under what authority he could have had access to the relevant internal financial data.

In view of the foregoing, the court concludes that Heller's station and the Citgo station, designated by the government as the "nearest comparable outlet" for purposes of prosecution under the New Item rule in this case, are not comparable as a matter of law. Finding that no reasonable jury could conclude otherwise, the court hereby orders that all evidence on the issue of "comparability" concerning the two subject stations be suppressed from use at the trial.

An order will issue.

### ORDER

For the reasons stated in an opinion issued this date, the court orders as follows:

1) Defendant's motion to dismiss the indictment, on the basis of administrative "exception relief" orders concerning his station issued by the Federal Energy Regulatory Commission, is hereby denied.

2) Defendant's motion to suppress all evidence on the issue of the "comparability" of his station to the government-designated "nearest comparable outlet", the Citgo Station at 326 Cambridge Street, Boston, is hereby allowed.

It is so ORDERED.