UNITED STATES of America,
Appellant,

v.

Glenn Martin HELLER, d/b/a Beacon
Hill Gulf, Appellee.

No. 1–13.

Temporary Emergency Court of Appeals.

Argued April 15, 1983.

Decided Dec. 12, 1983.

Robert N. Werlin, Atty., Dept. of Energy, William F. Weld, U.S. Atty., Boston, Mass. with Kathleen A. Felton, Atty., Dept. of Justice, Washington, D.C., for appellant.

Harvey A. Silverglate, Boston, Mass. with James L. Sultan, Silverglate & Gertner, Boston, Mass., for appellee.

Before GIGNOUX, METZNER and LACEY, Judges.

LACEY, Judge.

Defendant-appellee Glenn Martin Heller stands accused of willfully selling gasoline

at prices in excess of those authorized by federal regulations, a criminal offense under Section 5 of the Emergency Petroleum Allocation Act of 1973, as amended (the Act), 15 U.S.C. § 754(a)(3)(B) (1976). To prove Heller's guilt, the government would first have to prove the maximum allowable price, which in Heller's case would be calculated by reference to the "nearest comparable outlet." 10 C.F.R. § 212.111(b)(3) (1979).[1] The government designated a particular service station, operated by the Cities Service Company ("Cities Service" or "Citgo") and located at 326 Cambridge Street, Boston, Massachusetts, as the nearest comparable outlet. The district court then granted Heller's motion to suppress all evidence regarding the comparability of his station and the Citgo station. The issue on this appeal is whether the district court erred in holding that, because Heller's was an independent retail station while the Citgo station was refiner-operated, the two outlets were not comparable as a matter of law. Because the ownership of the outlet does not determine comparability, but is merely one factor to be considered in making such a determination, we reverse.

## I.

Familiarity with our earlier opinion in this case, *United States v. Heller*, 635 F.2d 848 (Temp.Emer.Ct.App.1980) (*Heller I*), is assumed. Because that opinion sets out the factual background and regulatory scheme in some detail, this opinion will only set forth those facts necessary for understanding the issues on this appeal.

Glenn Martin Heller, doing business as Beacon Hill Gulf, operated a retail gasoline station at 358 Cambridge Street, Boston, Massachusetts under lease from the Gulf Oil Corporation (Gulf), commencing on or about August 18, 1976. In August 1979, a grand jury returned an indictment charging that, between June 1 and June 14, 1979, Heller willfully sold gasoline at prices in excess of those authorized by federal regulations.[2] The regulations, 10 C.F.R. Part 212, were promulgated pursuant to section 4(a) of the Act, 15 U.S.C. § 753(a), by the Federal Energy Office (FEO) (now Department of Energy (DOE)).[3] They set up a system of mandatory price controls covering a number of petroleum products, including gasoline. The regulatory scheme generally uses May 15, 1973, as a base price date; a seller's allowable prices are calculated by adding his increased product costs to "the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned on May 15, 1973." 10 C.F.R. § 212.93. A seller such as Heller, who was not in business or did not sell a particular covered product on May 15, 1973, must refer either to 10 C.F.R. § 212.111(b), the "new item" rule, or to 10 C.F.R. § 212.111(c), the "ac-

---

**1.** All citations of the Code of Federal Regulations will refer to the 1979 version unless otherwise noted.

**2.** Heller's indictment was returned under section 5 of the Emergency Petroleum Allocation Act of 1973 (the Act), 15 U.S.C. § 754 which specifies criminal penalties for violation of the Act:

> Whoever willfully violates any provision of [a regulation or order promulgated under § 753(a)] shall be imprisoned not more than 1 year, or—

> (iii) with respect to activities relating to the distribution of residual fuel oil or any refined petroleum product at the retail level . . . shall be fined not more than $10,000 for each violation; or both.

15 U.S.C. § 754(a)(3)(B)(iii) (1976).

**3.** That section provides

> Not later than fifteen days after November 27, 1973, the President shall promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in (or determined in a manner prescribed by) such regulation. Subject to subsection (d) of this section, such regulation shall take effect not later than fifteen days after its promulgation. Such regulation shall apply to all crude oil, residual fuel oil, and refined petroleum products produced in or imported into the United States.

15 U.S.C. § 753(a) (1976).

On January 28, 1981, the President issued an executive order that immediately exempted motor gasoline from the price and allocation controls adopted pursuant to the Act. Exec. Order No. 12287, 46 Fed.Reg. 9909 (1981).

quisition" rule, in order to determine his base price.

Because of the result we reached in *Heller I*, see *infra* p. 759, the "new item" rule is the only one of the two that is relevant to this appeal. That rule defines a "new item" as one which "[t]he firm concerned did not produce or sell ... in the same or substantially similar form at any time during the one-year period immediately preceding the day on which the firm offers it for sale," and which "is substantially different in purpose, function, quality, or technology, or its use or service effects a substantially different result from any other item which the firm concerned currently sells or sold at any time during the 1-year period immediately preceding the first date on which the firm offers it for sale." 10 C.F.R. § 212.-111(a)(1). The rule then provides:

(b) *Base price determination*

(1) *Refiners.* (i) A refiner in existence on May 15, 1973 which offers a new item shall determine the base price for that item pursuant to the base price provisions of § 212.82(b). However, for purposes of determining the price at which the item was lawfully priced in transactions on May 15, 1973, the refiner shall use the average price received on May 15, 1973 for the same or most nearly similar item sold to the same market by other refiners selling the same or most nearly comparable item in the same marketing area.

(ii) A refiner coming into existence after May 15, 1973 which offers a new item shall determine the base price for that item pursuant to the base price provisions of § 212.82(b). However, for purposes of computing the base price, the increased product costs shall be calculated using the cost of the item first offered for sale rather than the May 1973 cost for the item, and the price at which that item is priced in transactions by other refiners selling the same or most nearly comparable item in the same marketing area on the day when the item is first offered for sale shall be used rather than the May 15, 1973 selling price.

(3) *Resellers.* A reseller, reseller-retailer or retailer, offering a "new item," shall for purposes of applying the price rule of § 212.93 determine the May 15, 1973 selling price for that item as the price at which that item is placed in transactions at the nearest comparable outlet on the day when the item is first offered for sale....

*Id.* § 212.111(b). The parties agree that Citgo is a "refiner" and Heller is a "retailer," as those terms are defined in 10 C.F.R. § 212.31.[4]

Heller was tried before a jury on the theory that he had violated either the "acquisition" rule or the "new item" rule. The evidence included the testimony of Fred Bernard, manager of pricing allocation for Cities Service Company, who testified as to the retail prices charged by the Citgo station at 326 Cambridge Street, Boston, during August 1976. This testimony was adduced by the government, on the assumption that the Citgo station was comparable to Heller's station, within the meaning of the "nearest comparable outlet" language of the new item rule. The district court

4. A "refiner" is "a firm (other than a reseller or retailer) or that part of such a firm which refines covered products or blends and substantially changes covered products, or refines liquid hydrocarbons from oil and gas field gases or recovers liquified petroleum gases incident to petroleum refining and sells those products to resellers, retailers, reseller-retailers, or ultimate consumers." 10 C.F.R. § 212.31.

A "retailer" is "a firm (other than a refiner or reseller) or that part of such a firm which carries on the trade or business of purchasing covered products and reselling them to ultimate consumers without substantially changing their form." *Id.*

submitted the case to the jury with an instruction that assumed Heller had violated one of the rules, but did not require the jury to specify which rule he had violated; the jury was asked to determine only the issues of willfulness. The jury returned a verdict of guilty on all counts submitted to them.

This court reversed Heller's conviction on appeal, finding that the trial court erred in its instructions to the jury. We held, first, that Heller was not subject to the "acquisition" rule, and thus could not have violated it. *Heller I, supra,* 635 F.2d at 855–56. Next, we found that although Heller was subject to the "new item" rule, the trial court was not entitled to find as a matter of law that he had violated it. *Id.* at 855–57. As we stated,

> [T]he new-item rule requires that the base price of an item that falls within its purview be determined by applying to that item the nearest comparable outlet's base price for the same item. The testimony of Bernard of Cities Service Company ... offered by the government, was addressed to this subject.
>
> The issue of comparability was a question for the jury. Regrettably, the trial court, by its instruction, removed this issue from jury consideration. To do so was error.

*Id.* at 857. The case was remanded for a new trial.

On remand, the government filed an amended bill of particulars specifying the Citgo outlet located at 326 Cambridge Street, Boston, as the "nearest comparable outlet" within the meaning of the new item rule.[5] App. at 32. Heller then moved to dismiss the indictment on a number of grounds. He argued, *inter alia,* that the Citgo outlet was not comparable to his outlet as a matter of law, and that recent DOE administrative proceedings precluded any conviction under the indictment. In the alternative, he moved to suppress all evidence relating to the comparability of the two outlets. App. at 33–35.

The administrative proceedings may be summarized as follows. On December 13, 1978, DOE served Heller with a Notice of Probable Violation (NOPV), alleging that he had overcharged his customers since August 1976. App. at 230. On December 22, 1978, DOE served him with an Interim Remedial Order for Immediate Compliance (IROIC). *Id.* In January 1979, Heller applied for first, a temporary, and then a permanent stay, of the IROIC; DOE granted both requests. *Id.* On February 1, 1979 (some six months before his indictment), Heller filed an application with DOE for retroactive and prospective relief from the pricing regulations of Part 212, pursuant to 10 C.F.R. Part 205, Subpart D. *Id.* at 221. On October 7, 1981, DOE's Office of Hearings and Appeals (OHA) granted retroactive exception relief for the period from September 26, 1976 through July 15, 1979.[6] *Id.* at 226. Finding that "[a]dherence to the price regulations [of Part 212] would have forced Heller to abandon his operation of the outlet," the OHA allowed him a maximum mark-up of 14 cents per gallon over acquisition cost, for the relevant period. *Id.* at 225. On March 8, 1982, the Federal Energy Regulatory Commission (FERC) is-

---

**5.** The government on remand had initially filed a bill of particulars specifying the Cities Service outlet as the nearest comparable outlet, but also stating that it would offer evidence of comparability if any other outlet was considered the nearest comparable one. Joint Appendix (App.) at 26–27. After Heller moved to strike all references to outlets other than the Cities Service outlet, App. at 28–29, and moved for an order requiring the government to pro-

vide further particulars, App. at 30–31, the government filed the amended bill of particulars.

**6.** The OHA found prospective relief unnecessary, in light of the President's exemption of motor gasoline from the Part 212 regulations. App. at 223; *see supra,* n. 3.

sued a proposed order upholding the grant of retroactive exception relief and increasing Heller's maximum mark-up to 15.2 cents per gallon. *Id.* at 235. The order became final on August 27, 1982. *Id.* at 236–41.[7]

## II.

After holding an evidentiary hearing on the comparability of Heller's station and the Citgo station located at 326 Cambridge Street, App. at 59–200, the district court denied Heller's motion to dismiss the indictment but granted his motion to suppress. The court's opinion discussed only two of the grounds that Heller had raised in support of his motion. First, the court considered and rejected Heller's argument that the OHA's grant of retroactive exception relief precluded any conviction under the pending indictment. Heller had argued that the exception relief barred application of the Part 212 regulations to his case; the district court held, however, that the administrative order did not automatically invalidate the criminal indictment charging Heller with violation of those regulations. *United States v. Heller,* 542 F.Supp. 157, 161 (D.Mass.1982). Heller has not appealed from this ruling.[8]

The district court then turned to Heller's argument that his station and the Citgo station were not comparable as a matter of law, because the Citgo station was operated by an oil refiner (Cities Service), whereas he was an independent retailer. The court, after noting that this court had characterized the issue of comparability as a question of fact for the jury, found it "necessary ... to review the relevant regulatory scheme to determine whether it [would be] appropriate for the [district court] to address the factual arguments and evidence" presented at the hearing. *Id.* The district court believed that the Part 212 regulations treated refiners and retailers differently in at least three ways.[9] First, the court stated that the regulations governing refiners' base prices, in Part 212, Subpart E, allowed refiners to pass through to gasoline purchasers all increased costs, both those incurred in obtaining the product and those "non-product costs" attributable to the sale of the product, 10 C.F.R. § 212.83(c)(1); retailers, on the other hand, were governed by Part 212, Subpart F, which allowed them to pass along their increased product costs but restricted the pass-through of increased non-product costs. *Id.* § 212.93(a), (b). Second, the district court believed that the regulations gave refiners, but not retailers, "the flexibility to apportion increased cost of production or marketing *between* different products." *United States v. Heller, supra,* 542 F.Supp. at 162 (emphasis in original).[10] Third, the court pointed out that a refiner could charge a different price to each "class of purchaser" to whom it sold; thus, the court believed, a refiner could charge a wholly-owned dealership less than it would charge an independent retailer. *Id.*[11] Taking all of these perceived differences into account, the court found that the regulatory scheme "established a fundamental conceptual and practical distinction between independent retail outlets and refiner-operated outlets." *Id.* at 165. It concluded that,

[i]n view of the significant practical effects that the differences in regulatory price treatment inevitably must have on

---

7. At the time of the hearing before the district court, the court and parties would only have been aware of the OHA's October 7, 1981, decision. The FERC's March 8, 1982, proposed order would have become known during the period when the case was under advisement.

8. He has, however, argued that the administrative order provides further support for the district court's decision on his alternative motion to suppress evidence. *See* text, *infra* pp. 763–764.

9. Part 212 divides sellers of petroleum products into three categories, "refiners," "resellers and retailers," and "producers." The third category, "producers," is covered by Subpart D and is not relevant here.

10. The district court's interpretation of the regulations was not entirely accurate. *See* text, *infra* pp. 763–764.

11. Again, the district court's reading was not entirely correct. *See* text, *infra* pp. 763–764.

the operations of "retailers" and "refiners", ... the question of whether a refiner's outlet may be considered "comparable" to a station like Heller's for purposes of applying the Part 212 regulations is a legal issue to be determined by the court. In making that determination, however, it is appropriate for the court to consider the factual evidence and arguments that the parties presented concerning the "comparability" issue in this case.

*Id.* at 163.

The evidence adduced at the hearing [12] showed that the two stations were similar in many respects. The Citgo station was the outlet "physically nearest to Beacon Hill Gulf at the time Heller began his retail gasoline sales." *Id.* at 163–64. Heller leased his station from Gulf; Cities Service leased the Citgo station from the Jenney Manufacturing Co. *Id.* Heller's station covered an area of approximately 1,771 square feet; the Citgo station occupied approximately 3,876 square feet. *Id.* Each station contained one "island" of hoses and pumps, which could accommodate up to four vehicles at a time. *Id.* Neither had the capacity to "stack" a significant number of cars; neither performed any repair work. *Id.* Neither sold tires, batteries, or accessories; the sale of branded gasoline was the chief source of income for both stations. *Id.* Both were intended to operate on a twenty-four-hour a day basis, but neither was operating around the clock in August, 1976.[13] Rents paid by the two stations were approximately the same, and their expense patterns were similar. *Id.* at 164–65. Hel-

ler sold approximately 45,000 gallons per month; between July and September, 1976, the Citgo station's sales ranged from 30,000 to 52,000 gallons per month. *Id.* at 165. The major difference between the stations, and the one that proved crucial to the district court's decision, was the one already mentioned: the Citgo station was operated by a refiner, while Heller was an independent retailer.

Two principal consequences of this distinction emerged from the testimony.[14] First, independent retailers generally paid higher prices for their gasoline than refiner-operated outlets did. Suppliers calculated their prices according to different formulae for different types of purchasers. Under the terms of his lease, Heller purchased his gasoline from Gulf; the district court found that, as an independent retailer, Heller paid a price known in the industry as the "dealer tank-wagon price," computed by adding transportation and marketing costs to the costs of producing refined gasoline. *Id.* at 163. The Citgo station, on the other hand, obtained all of its gasoline from the parent refining company, Cities Service. The court found that the price that would be attributed to that gasoline on the books of the station and of the parent company would be set according to the "transfer replacement cost value," which included the costs of raw materials, manufacturing, and transportation of the finished product to a distribution point in Braintree, Massachusetts. *Id.* at 164. The transfer replacement cost value was generally lower than the dealer tank-wagon

---

**12.** Heller's witnesses at the hearing were himself and Maurice G. Langelier, President of the Petroleum Management Consulting Corporation and past Executive Director of the Bay State Gasoline Retailers Association. The government presented the testimony of Bob Clingan, Controller of Retail Marketing and past Northeast Division Sales Manager for Cities Service Company; Louis Christodoulou, Product Supply Manager and past Northeast Division Sales Manager and Assistant Manager for Cities Service; Frank Napoli, Cities Service's Supervisor of Cash Receipts; and Richard Huggett, Manager of the Citgo station at 326 Cambridge Street from July 1976 until the fall of that year.

**13.** The parties disputed whether the Citgo station was open and selling gasoline on and around August 18, 1976, when Heller began his retail gasoline sales. *United States v. Heller,* 542 F.Supp. 157, 164 n. 36 (D.Mass.1982). Because of its disposition of Heller's motion, the district court did not decide this issue.

**14.** These were in addition to the "significant practical effects" that the district court found the regulatory scheme to have created. *United States v. Heller, supra,* 542 F.Supp. at 163.

price. *Id.* Because the Citgo station paid less than Heller did for its gasoline, the district court reasoned, it could sell its gasoline at lower prices than he could. *Id.* at 165.

The second consequence of the refiner-retailer distinction found by the district court was that Cities Service, as a vertically integrated company, could absorb retail losses for a much longer period than an independent retailer, such as Heller, could. The court relied on the testimony of Heller's expert, Maurice Langelier,[15] who stated that a parent refining company, such as Cities Service, could operate a retail outlet at a loss almost indefinitely, as long as the company as a whole earned net profits. *Id.* at 165–66. The testimony of Cities Service employees Robert Clingan and Louis Christoudoulou[16] showed that, although retail prices were set with the goal of maximizing profits, the Citgo station at 326 Cambridge Street had in fact operated at a net loss during 1976 and 1977. An independent retailer, on the other hand, could not absorb losses for more than a month, according to Mr. Langelier. *Id.* Thus, the district court believed, the parent company could in effect subsidize the Citgo station, allowing it to charge lower prices than could Heller, who enjoyed no such subsidy.[17]

The district court concluded that, although the two stations were "superficially similar in some respects," they are not comparable as a matter of law because "Citgo, as a refiner-operated outlet, had the opportunity to sell gasoline at lower prices than did Heller." *Id.* at 165. Whether Citgo actually employed this advantage was "irrelevant"; what mattered was that the

"disparate impact of the regulatory scheme afforded Citgo the unique opportunity to do so." *Id.* The court concluded that this disparity was so great that no reasonable jury could find the two stations "comparable," within the meaning of the new item rule. *Id.* The motion to suppress was granted, and this appeal followed.

### III.

■ Our task is to ascertain the meaning of "comparable," under the "new item" rule.[18] In construing regulations, as with statutes, we look first to the plain meaning of the language used. *E.g., KCMC, Inc. v. FCC,* 600 F.2d 546, 549 (5th Cir.1979). If that is ambiguous, we turn to the administrative interpretation of the regulation, " 'which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation,' " *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)), or inconsistent with the statute under which it is promulgated. *Id.* 431 U.S. at 873, 97 S.Ct. at 2156. In the absence of an administrative interpretation, a court applies the normal principles of statutory construction, considering such factors as the overall purpose of the governing statute, the overall purpose of the regulation, its history, and the practical consequences of suggested interpretations in order to determine the intent of the enacting body. *See, e.g., New York State Commission of Cable Television v. FCC,* 571 F.2d 95, 98 (2d Cir.), *cert. denied,* 439 U.S. 820, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978).

---

**15.** For Langelier's qualifications, *see supra* n. 12.

**16.** *See supra* n. 12.

**17.** The district court found that the prices set by Clingan and Christodoulou at the Citgo station were the highest prices set by them as any Citgo station in the Boston area, but that the station nevertheless operated at a net loss during 1976 and 1977. *United States v. Heller, supra,* 542 F.Supp. at 165.

**18.** Before doing so, we note that jurisdiction exists pursuant to 18 U.S.C. § 3731, which allows the government to take an interlocutory appeal from a district court's grant of a motion to suppress evidence in a criminal case. When the government takes such an appeal, it is required to file a certificate with the district court, stating that "the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." 18 U.S.C. § 3731. While not a part of the record on appeal, a copy of such a certificate has been furnished to the court.

In this case, the language of the "new item" rule is not determinative. The subsection that applies to retailers, 10 C.F.R. § 212.111(b)(3), states that a retailer shall use as its base price "the price at which th[e new] item is priced in transactions at the nearest comparable outlet on the day when the item is first offered for sale." Nowhere in Subpart 212 are the words "comparable" or "nearest comparable outlet" defined. *See* 10 C.F.R. § 212.31 (definitions). Looked at in isolation, the term "comparable" is broad enough to support either the government's or Heller's interpretation. It is worth noting, however, that the rule on its face does not limit the retailer to using the price at the nearest comparable outlet operated by a retailer. This is significant because the subsection of the rule that applies to refiners, 10 C.F.R. § 212.111(b)(1), specifically provides that a refiner offering a new item shall use as its base price "the price at which that item is priced in transactions *by other refiners* selling the same or most nearly comparable item in the same marketing area on the day when the item is first offered for sale" (emphasis added). The DOE's use of such a specific limitation in a related portion of the "new item" rule reflects that the agency knew how to restrict "comparability" to a particular market level when it intended to do so, and weighs in favor of the conclusion that the agency, in promulgating subsection 3 of the rule, did not intend to limit the "nearest comparable outlet" to one operated by a retailer. *See FTC v. Sun Oil Co.*, 371 U.S. 505, 514–15, 83 S.Ct. 358, 364, 9 L.Ed.2d 466 (1963); *Heller I, supra,* 635 F.2d at 855 n. 12 ("Where particular language is used in one section but not another, the term or its equivalent should not be implied where excluded"); *KCMC, Inc. v. FCC, supra,* 600 F.2d at 550.

The parties have not cited, nor has our research disclosed, any administrative interpretation of the term "nearest comparable outlet." Heller attempts to argue that the FERC, in granting him retroactive exception relief, recognized that his service station was unique; thus, Heller asserts, his outlet could not be "comparable" to the Citgo station (or to any other station, if the argument is taken to its logical extreme). This argument is not supported by the agency's decision, however. The administrative proceedings dealt only with Heller's allowable mark-up, which was governed by 10 C.F.R. § 212.93. It is true that the allowable mark-up is calculated with reference to the base price; but the DOE (despite its recognition that the new item rule applied to Heller) used the price charged by the previous operator of Beacon Hill Gulf on May 15, 1973 as Heller's base price. App. at 225 & n. 1. Thus, the agency did not even consider the issue of comparability.

Finding the rule's language ambiguous, and receiving no administrative guidance, we turn to the regulation's history and purpose. The history of the "new item" rule, like its language, is inconclusive. The "nearest comparable outlet" language can be traced through the rule's predecessor regulations, 6 C.F.R. § 150.36(b)(3) (effective November 2, 1973, 6 C.F.R. § 150.-359(b) (promulgated August 22, 1973), all of which use the phrase. The mere repetition of the phrase, however, sheds no light on its meaning. The August 22, 1973 regulation is ultimately traceable to one of the Cost of Living Council's Phase II regulations, 6 C.F.R. § 300.509, which required a new market entrant (in any sector of the economy) to use as his initial price "the average prices received in a substantial number of arm's length transactions by persons selling or leasing a comparable property or services in the same market area." This language, with its emphasis on the nature of the property or service sold, rather than the nature of the seller, provides only slight support for the government's argument; the connection between this regulation and the new item rule is attenuated since 6 C.F.R. § 300.509 did not refer specifically to petroleum sellers and almost certainly was not drafted with the refiner-retailer distinction in mind.

The district court's opinion was based on the overall structure of the regulatory scheme, and in particular on the different

pricing rules for refiners and retailers. It is true that refiners calculated their allowable price increases in accordance with Part 212, Subpart E, whereas retailers were governed by Subpart F. The differences between the two sets of rules are not as great, however, as the district court believed. It is not true, for example, that refiners could allocate increased costs of gasoline to any product other than gasoline. *See* 10 C.F.R. § 212.83(d)(4).[19] Nor were refiners required to distinguish between dealers who leased their stations and those who did not, in setting their prices. Federal Energy Agency Ruling 75–2, on which the district court relied in part, merely provides that where price differentials existed on May 15, 1973, the "class of purchaser" concept, 10 C.F.R. § 212.31, requires a seller to perpetuate those differences, in passing through increased products costs. Retailers, as well as refiners, were governed by this ruling. *See* 10 C.F.R. § 212.93(a).

Moreover, the regulatory scheme's differing provisions for sellers at different levels of the marketing and distribution chain were all intended to serve the same purposes. The Act requires that the pricing regulations shall provide, *inter alia,* for "preservation of an economically sound and competitive petroleum industry" at all levels, including "the producing, refining, distribution, marketing, and petrochemical sectors of [the] industry," 15 U.S.C. § 753(b)(1)(D); for "equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all ... sectors of the petroleum industry," *id.* § 753(b)(1)(F); for "economic efficiency," *id.* § 753(b)(1)(H); and for "minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms." *Id.* § 753(b)(1)(I). In order to achieve these goals, prices were frozen as of May 15, 1973 and sellers were allowed to increase their prices only to reflect increased costs. The

statute makes clear that the basic framework of the price control system was to be the same for all types of sellers. *See* id. § 753(b)(2)(A), (C). Although the details of Subpart E and F varied in order to take account of the different cost structures at two different levels within the petroleum industry, the overall effect was to be the same. So, too, the "new item" rule, which provides a substitute for a seller's own May 15, 1973 price where none is available, contains separate provisions for refiners and resellers, but intends to achieve the same result for members of both groups: i.e., to place the seller in the position it would have occupied if it had been selling the item in question on May 15, 1973. The fact that the drafters of the regulation explicitly limited refiners to consideration of other refiners' prices but did not limit resellers to prices charged by other resellers strongly suggests that the drafters of the regulation did not intend to remove a refiner-operated outlet from the consideration of the reseller, the DOE, or (in this case) the jury. *See supra* p. 760.

■ We conclude that the identity of the seller is only one factor to be considered, along with other factors, including the outlet's location, its size, and the services it offers. This result is consistent with the statute's purposes. A corner gas station sells at the retail level, whether it is operated by a refiner or a retailer.[20] Since the market level is the same, there is no reason why a refiner-operated station cannot be "comparable" to a retailer-operated one, for the limited purpose of determining what the retailer's price would most likely have been if the retailer had been selling the item on May 15, 1973. The practical consequences of this interpretation also appear preferable: a new retailer can readily determine his reference price from stations nearby; the nature of the ownership is not so easily ascertained.

---

**19.** They could apportion increased costs among various categories of gasoline, however. 10 C.F.R. § 212.83(c)(1)(ii).

**20.** The fact that the regulations define a refiner as a "refiner" rather than a "retailer," even when the refiner sells to ultimate consumers, 10 C.F.R. § 212.31, *supra* n. 4, should not be allowed to obscure this fact.

Accordingly, we hold that the comparability issue is a question of fact, to be determined by the jury, under appropriate instructions from the trial court. For example, if Heller should prove that the Citgo station by reason of its status, actually enjoyed and used an opportunity to sell gasoline at lower prices than Heller could, and if the jury believes that this evidence outweighs other evidence which may tend to prove that the two stations are comparable, then the jury would be entitled to find that the Citgo station is not the "nearest comparable outlet."

The order of the district court is vacated, and the matter is remanded to that court for further proceedings consistent with this opinion.